# CASE NOS.
# 23-1014 & 23-1029

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

_____

### UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

v.

### ADAM FOX

and

### BARRY CROFT, JR.,

*Defendants/Appellants.*

_____

## CONSOLIDATED SUPPLEMENTAL BRIEF OF
## APPELLANTS ADAM FOX AND BARRY CROFT, JR.

Steven S. Nolder (0037795)
65 East State Street, Suite 200
Columbus, Ohio 43215
Phone: (614) 221-9790
Email: snolder9@gmail.com

Timothy F. Sweeney (0040027)
LAW OFFICE OF TIMOTHY F. SWEENEY
820 West Superior Ave., Suite 430
Cleveland, Ohio 44113
Phone: (216) 241-5003
Fax: (216) 241-3131
Email: tim@timsweeneylaw.com

Counsel for Appellant Adam Fox

Counsel for Appellant Barry Croft, Jr.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ....................................................... iii

CONSOLIDATED SUPPLEMENTAL BRIEF OF APPELLANTS ........................ 1

I. The Government Waived a Harmless Error Argument .......................... 1

II. The District Court's Application of Fed. R. Evid. 801(d)(2)(D) to Deny Appellants' Ability to Present Their Defense was not Harmless Error. ................... 3

  A. Introduction. ............................................................... 3

  B. The excluded 801(d)(2)(D) government admissions and their impact on the entrapment defense. ........................................................ 6

    Table of Topics .......................................................... 10

    1. Chambers, Robeson, Chappel et al. organized and planned the FTXs and ran the Peebles event. ................................................ 12

    2. Chambers, Chappel, Robeson, et al. engaged in a persistent and continuous push for "conspirators" to come up with a "plan" or "objective," and otherwise sought to lead and manipulate the group's thinking about activities & goals. ........................................................ 14

    3. Chambers, Chappel, Robeson, and Plunk knew that other "conspirators" did not like/trust Croft and/or believed he was not interested, which they had to overcome. ........................................................ 17

    4. Chambers and Chappel planned, organized, promoted, and conducted the 8/29/20 and 9/12/20 drive-bys of the governor's cottage and related events. .................................................................. 18

    5. Chambers, Bates/Red, Chappel and others promoted the use of explosives including with the FBI's "bomb" video. .......................... 22

    6. Chambers, Chappel pushed for action before "spring," and wanted events "sooner." ......................................................... 23

7. Chambers, Robeson, Chappel, and other agents promoted availability of "free" money to help "fund" the group's goals and they encouraged and/or tolerated other illegal/unethical activities in luring the targets into the FBI's trap. ...................................................................................................23

8. Chambers, Chappel, and Bates/Red planned, organized, promoted, and conducted the Ypsilanti ruse trip on 10/7/20. ..............................................27

9. Some examples of the court's ruling in action as applied to 801(d)(2)(D) admissions by or about non-testifying government agents Chappel, Robeson and/or Plunk. ...................................................................................................28

C. The court's order barring the 801(d)(2)(D) admissions was not harmless. This was a very close case; Appellants would likely have been acquitted if 801(d)(2)(D) was properly applied. ......................................................................31

III. Conclusion ...............................................................................................37

CERTIFICATE OF COMPLIANCE ........................................................38

CERTIFICATE OF SERVICE ..................................................................38

# TABLE OF AUTHORITIES

## Cases

Ashcraft & Gerel v. Coady, 244 F.3d 948 (D.C. Cir. 2001)......................................6

Brecht v. Abrahamson, 507 U.S. 619 (1993) .............................................................31

Calvert v. Wilson, 288 F.3d 823 (6th Cir. 2002) ........................................................2

Chambers v. Mississippi, 410 U.S. 284 (1973) .........................................................31

Chapman v. California, 386 U.S. 18, 24 (1967) ............................... 2, 3, 31, 32, 35

Ellis v. United States, 941 A.2d 1042 (D.C. App. 2008)................................. 32, 36

Hargrave v. McKee, 248 Fed. Appx. 718 (6th Cir. 2007)..........................................2

Jackson v. Virginia, 443 U.S. 307 (1979).......................................................... 32, 33

Jacobson v. United States, 503 U.S. 540 (1992) .........................................................3

Kotteakos v. United States, 328 U.S. 750 (1946) ...................................................3, 33

Moore v. LaFayette Life Ins. Co., 458 F.3d 416 (6th Cir. 2006) .............................2

Neder v. United States, 527 U.S. 1 (1999) ................................................................32

Rose v. Clark, 478 U.S. 570 (1986) ..........................................................................31

Sherman v. United States, 356 U.S. 369 (1958) ........................... 8, 9, 27, 31, 36

Sorrells v. United States, 287 U.S. 435 (1932) ..........................................................8

Strickland v. Washington, 466 U.S. 668 (1984).......................................................33

Sullivan v. Louisiana, 508 U.S. 275 (1993).............................................................32

United States v. Agrawal, 97 F.4th 421 (6th Cir. 2024)..........................................33

United States v. Bell, 516 F.3d 432 (6th Cir. 2008) .................................................33

United States v. Branham, 97 F.3d 835 (6th Cir. 1996) ............................ 1, 7, 8, 36

United States v. Carter, 491 F.2d 625 (5th Cir. 1974) ...............................4, 32

United States v. Corona, 41 Fed. Appx. 33 (9th Cir. 2002) ...............................5, 32

United States v. Evans, 728 F.3d 953 (9th Cir. 2013) ................................... 5, 6, 32

United States v. Harris, 733 F.2d 994 (2d Cir. 1984)...................................3, 4, 32

United States v. Haywood, 280 F.3d 715 (6th Cir. 2002) ........................................33

United States v. Ignasiak, 667 F.3d 1217 (11th Cir. 2012) ...................................33

United States v. Johnson, 855 F.2d 299 (6th Cir. 1988) ..........................................34

United States v. Kettles, 970 F.3d 637 (6th Cir. 2020) .............................. 32, 33, 35

United States v. Kohan, 806 F.2d 18 (2d Cir. 1986) ...........................................4, 32

United States v. Martin, 780 Fed. Appx. 248 (6th Cir. 2019) ............................3, 34

United States v. Molt, 615 F.2d 141 (3rd Cir. 1980)...............................................33

United States v. Nelson, 922 F.2d 311 (6th Cir. 1990) ...........................................34

United States v. Peak, 856 F.2d 825 (7th Cir. 1988)...........................................5, 32

United States v. Rhynes, 218 F.3d 310 (4th Cir. 2000) (en banc)..........................32

**Other Authorities**
Anne Bowen Poulin, Party Admissions in Criminal Cases: Should the
   Government Have to Eat Its Words?, 87 Minn. L. Rev. 401 (Dec. 2002)..............9

**Rules**

Fed. R. Evid. 801(d)(2)(B) and (C)................................................................. 8, 9, 31

Fed. R. Evid. 801(d)(2)(D) ............................................................................. passim

Fed. R. Evid. 801(d)(2)(E).....................................................................................31

## CONSOLIDATED SUPPLEMENTAL BRIEF OF
## APPELLANTS FOX AND CROFT

On May 10, 2024, the Clerk's Office sought supplemental briefing to address the following question:

> [A]ssuming that the informants' out-of-court statements should have been admitted, was the district court's error in excluding those statements harmful or harmless and why? Please provide citations to the record detailing what was excluded and what was admitted, and explain what effect that had.

For ease of presentation, and because their arguments on this issue are the same in significant respects, Appellants Adam Fox and Barry Croft, Jr. are hereby submitting one consolidated supplemental brief (which they will each electronically file in their respective case numbers).

## I. The Government Waived a Harmless Error Argument.

In their briefs, both Appellants argued the district court's application of Fed. R. Evid. 801(d)(2)(D) was at odds with this Court's decision in United States v. Branham, 97 F.3d 835 (6th Cir. 1996). (R. 26, Fox Brief, PageID #66-69; R. 28, Croft Brief, PageID #64-75.) The government responded by arguing the district court's application of Branham was appropriate. (R. 35, Government Brief, PageID #111-19.) However, in the last sentence of its brief, the government posited that "[E]ven if it had (district court abused its discretion by excluding the evidence), the defendants have not identified any particular rulings which, had they gone the other way, would have 'substantially swayed' the outcome of the trial." Id. at 119.

The government's failure to develop a harmless error argument surfaced at oral argument on May 2, 2024. At oral argument, Judge Larsen observed that the government was now arguing to the appellate court that the district court's handling of the Rule 801(d)(2)(D) issue was harmless. However, Judge Larsen also noted there was only one sentence in the government's brief hinting at harmlessness and it was the government's burden to establish that the error was harmless. (Oral Argument 31:34-31:41.)

The burden is on the government to demonstrate the error was harmless. Chapman v. California, 386 U.S. 18, 24 (1967). Importantly, by relying on such a perfunctory, one sentence discussion of harmless error, the government waived the argument. Moore v. LaFayette Life Ins. Co., 458 F.3d 416, 448 (6th Cir. 2006).

In a habeas case, this Court held that "the state did not argue elsewhere in its brief that the state trial court's decision was harmless error. 'Even appellees waive arguments by failing to brief them,' and, accordingly, the state has waived any harmless-error argument." Hargrave v. McKee, 248 Fed. Appx. 718, 728 (6th Cir. 2007).

The policy grounds for this result were articulated by Judge Cole in his concurring opinion in Calvert v. Wilson, 288 F.3d 823 (6th Cir. 2002). In Calvert, the majority opinion affirmed the district court's issuance of the writ after addressing the merits of an issue the State perfunctorily dismissed, in a footnote, as harmless.

In his concurrence, Judge Cole agreed that Calvert was entitled to habeas relief but concluded it was not necessary to reach the merits of the issue because the State waived the harmless error argument. In his opinion, Judge Cole wrote:

> [W]hile a petitioner has the responsibility of ensuring that all claims in support of a petition for writ of habeas corpus are timely raised, so too does the warden bear the responsibility of ensuring all defenses, including harmless error, are timely raised.... Just as a defendant may not 'save' claims for strategic purposes, the state may not place the harmless error defense in an arsenal for safekeeping in the event that its substantive constitutional arguments fail. Both parties must present their cards at the outset; as [a] matter of fundamental fairness and judicial economy, hidden hands should not be encouraged.

Id. at 835–36.

Judge Cole concluded the harmlessness argument was waived because the State's appellate brief only mentioned harmless error in a footnote, in cursory terms, and without analysis. Id. at 836–37.

Based on this Circuit's jurisprudence as well as the perfunctory way the government raised the harmless error issue in its brief, the issue has been waived.

2

**II. The District Court's Application of Fed. R. Evid. 801(d)(2)(D) to Deny Appellants' Ability to Present Their Defense was not Harmless Error.**

**A. Introduction.**

In the event this Court finds the government has not waived the harmless error issue, the district court's exclusion of the communications among the agents/informants and their FBI handlers as well as communications between the agents/informants and between the agents/informants and their targets (including Croft and/or Fox), was not harmless error.

As discussed more below in Part II(C), the error here is of *constitutional* dimension and is thus subject to <u>Chapman's</u> harmless error standard. That standard requires the government to prove, beyond a reasonable doubt, that the error complained of did not contribute to the verdict obtained. The government cannot meet that high burden. Indeed, even under the less rigorous harmlessness standard, for *non-constitutional* errors in <u>Kotteakos v. United States</u>, 328 U.S. (1946), the government still fails.

It is also noteworthy that the error here does not involve the district court's erroneous *admission* of evidence which was prejudicial; instead, it is the court's *exclusion* of substantive evidence supporting the defendants' affirmative defense of entrapment. "[E]ntrapment is an affirmative defense developed by the Supreme Court and premised on the 'notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them by the Government.'" <u>United States v. Martin</u>, 780 Fed. Appx, 248, 249 (6th Cir. 2019). Entrapment cases are unique because the government must prove the elements of the charged offenses beyond a reasonable doubt as well as show, beyond a reasonable doubt, that its agents and informants did not entrap the defendant. <u>Jacobson v. United States,</u> 503 U.S. 540, 548-49 (1992).

The importance of this distinction on harmless error analysis—between erroneous admission of evidence, on the one hand, versus barring evidence which supports an affirmative defense, on the other—has been recognized by at least the Second, Fifth, Seventh, Ninth, and D.C. Circuits. It is pertinent here too.

For example, in <u>United States v. Harris</u>, 733 F.2d 994 (2d Cir. 1984), George Harris sought to advance the defense of duress in a narcotics case by arguing the

informant (Stewart) repeatedly pressured him to arrange a heroin deal. Id. at 1000. To support his defense, Harris wanted to call his parole officer and lawyer, based in Detroit, to prove Harris thought Stewart was a government agent. Id. at 1003. However, the district court excluded these witnesses after concluding "it is plainly blatantly hearsay, unreliable and self-serving." Id. at 1001.

On appeal, the Second Circuit found the district court's handling of this evidentiary issue was in error. Id. at 1004. The Second Circuit reversed Harris' conviction after finding that "[C]ourts are particularly reluctant to deem error harmless where . . . the error precludes or impairs the presentation of an accused's sole means of defense." Id. at 1005.

Several years later this harmless error issue arose in the same court in United States v. Kohan, 806 F.2d 18 (2d Cir. 1986). Jonathan Kohan and Daniel Lowery were charged with committing white-collar offenses. Lowery wanted to admit statements made to him by Steven Fellouris, to show how Fellouris solicited and received Kohan's and Lowery's assistance in the bank fraud scheme. Id. at 19. The admission of these statements was important to demonstrate both that the statements were made and that Lowery believed them to be true. Id. at 22. At the time of the trial, Fellouris was both a codefendant and fugitive. The district court sustained the government's hearsay objection and excluded Fellouris' statements. Id.

On appeal, the Second Circuit ruled the statements should have been admitted and the evidentiary error was not harmless. The panel followed the Harris decision and concluded that "[W]hen an erroneous evidentiary ruling precludes or impairs the presentation of a defendant's sole means of defense, we are reluctant to deem it harmless." Id. at 22.

In United States v. Carter, 491 F.2d 625 (5th Cir. 1974), Cassius Carter was on trial for receiving and concealing stolen cars. When Carter took the stand, he wanted to tell the jury about his receipt of a vehicle from his cousin. Id. at 628. Carter sought to admit the conversations he had with his cousin to "bolster his claim that he had no knowledge that the Pontiac Catalina allegedly obtained from his cousin was stolen." Id. The trial court allowed Cassius to tell the jury about "what happened," but excluded his cousin's statements as hearsay. Id.

On appeal, the Fifth Circuit found the evidentiary ruling was erroneous. Furthermore, the panel concluded that an error cannot be found harmless if it

"precludes or impairs the presentation of [a defendant's] sole means of defense." Id. at 630.

In United States v. Peak, 856 F.2d 825 (7th Cir. 1988), Buford and Bennie Peak went to trial on a narcotics conspiracy case. During Buford's case-in-chief, he testified that he intended to capture the government informant by luring him to his place of business. Id. at 833. Buford was also asked about a telephone conversation he had with Bennie and the trial court sustained the government's hearsay objection. According to the court, anything Bennie said during the call was hearsay. Id. Bennie sought to admit his statements made in the phone call, during Buford's cross-examination, to show he lacked the mens rea to join the conspiracy. Id.

On appeal, the Seventh Circuit found the district court's evidentiary ruling was in error and reversed Bennie's conviction. Moreover, the panel observed that:

> [i]t is always perilous to speculate on what the effect of evidence improperly excluded would have been. The lay mind evaluates evidence differently from the legal mind, and while many appellate judges have substantial experience with juries and perhaps great insight into the thinking process of juries, others do not. This is a reason to be wary about invoking the doctrine of harmless error with regard to evidentiary rulings in jury cases.

Id. at 834.

In United States v. Corona, 41 Fed. Appx 33 (9th Cir. 2002), the district court, like Judge Jonker in the case at bar, excluded an informant's statements that demonstrated the government's inducement. Corona was charged with violating the federal narcotics and firearms laws and at his trial, the district court excluded statements the government informant made to Corona that, if admitted, would have "bolstered his entrapment defense by showing that the informant's persistence ultimately persuaded him to participate in the transaction." Id. at 34.

On appeal the Ninth Circuit found the error was not harmless because the informant's statements were probative on the issue of government inducement and the error prevented Corona from supporting his claim of entrapment. Id. Additionally, this error undermined Corona's ability to present his defense in a complete and coherent fashion. Id.

In <u>United States v. Evans</u>, 728 F.3d 953 (9th Cir. 2013), Joseph Evans appealed his convictions for being an alien in the United States after deportation and misrepresenting his identity and citizenship to secure government benefits. Evans primary defense to the charges was that he was a United States citizen as evidenced by a "delayed birth certificate issued by the State of Idaho." <u>Id.</u> at 956. Evans sought to admit the certificate, but the district excluded it as being "substantively fraudulent." <u>Id.</u>

On appeal, the Ninth Circuit concluded that the trial court's erroneous exclusion of the "central piece of evidence" for Evans' "main defense" and which went to the "very heart" of the dispute could not be harmless. <u>Id.</u> at 967. This was the court's decision notwithstanding the government's claim that the volume and substance of its evidence was overwhelming. <u>Id.</u>

Finally, in a civil case, the D.C. Circuit ruled that an evidentiary error that went to "the very heart of [the defendant's] defense" and was "central to [his] defense" could not be deemed harmless "in the absence of any steps by the district court to mitigate the effects of the error." <u>Ashcraft & Gerel v. Coady</u>, 244 F.3d 948, 949, 954 (D.C. Cir. 2001).

The takeaway from these decisions is that there is an asymmetry between the erroneous admission of prejudicial evidence by the prosecutor and the exclusion of evidence that would support a defense. If the defendant was precluded or impaired in defending himself based on the district court's erroneous exclusion of evidence, the error cannot be harmless.

## B. The excluded 801(d)(2)(D) government admissions and their impact on the entrapment defense.

Many of the relevant communications—texts and audio-recorded statements—which were barred to the defense as substantive evidence under 801(d)(2)(D) by the district court's ruling are identified in the spreadsheet included with Appellants' pretrial motions filed before Trial 1, at R. 383-1, PageID #2575-2620. Some were also identified in motion papers filed by the defense before Trial 2. (See R. 666, 666-1 to 666-6, PageID #8384-8506.)

In its order before Trial 1, the district court recognized the basis for the admission of the communications in the spreadsheet was to:

6

…advance [defendants'] case, both on the entrapment theory and in otherwise defending against the conspiracy charged, the defense seeks to admit approximately two hundred fifty-eight out-of-court statements. (ECF No. 383). The statements are taken from proposed transcriptions of recorded conversations and originate either from the defendants themselves, federal agents, or confidential human sources (CHSs).

(R. 439, Order, PageID #2996-97.)

However, the district court denied their admission, ruling that:

…the best reading of Branham and Reed is that Rule 801(d)(2)(D) covers only those situations where an informant's words and actions are directly and expressly authorized by a government agent. Thus, where the informant's statement merely regurgitates words that were fed by a government agent, then (provided the offering party can establish relevance) the statement might be admissible.

(Id., PageID #3013).

The district court concluded its decision by noting that "[S]cripted words…, which are directly authorized and closely supervised by government agents fairly fall within the party-opponent exception." (Id., PageID #3014.) This was the court's rubric which it adopted by analogy from the movie "The Truman Show." (Id.; R. 487, Trans. 1/18/22 at 54-55, PageID #3706-07.) The court sometimes referred to the rule as the "Christof rule," from the film's character, "Christof" (played by Ed Harris). Christof was the "director" of the live reality TV show in which Truman (played by Jim Carey), was—unbeknownst to Truman as he lived what he believed was his ordinary life—the main character for the global audience who were addicted to the show. In a footnote, the Court observed that "[F]ew, if any, such [qualifying] statements appear on the defendants' chart (the chart with the 258 statements Appellants sought to admit) so far." (Id., PageID #3014, n. 11.)

As addressed in Croft's main brief, and not refuted, the issue was litigated again before Trial 2, with incorporation of many of the same filings including the spreadsheet. Unpersuaded again, the district court made the same ruling as in Trial 1, and it applied the ruling in Trial 2 the same way as it had done in Trial 1. See Croft Brief at pp. 59-60 (Citing R. 665-66, Motion & Brief (PageID #8382-8506); R. 670,

Croft Joinder (PageID #8538-39); R. 692, Order 07/28/22 (PageID #8686-88); R. 696, FPT at 12-15 (PageID #8721-24).)

As such, and as developed at the oral argument in this Court on May 2, 2024, the practical and actual effect of the district court's ruling and its associated "Truman Show" rubric, was that the court completely eliminated 801(d)(2)**(D)** from the trial as an evidence rule which could be used to benefit Croft and Fox. Instead, the court collapsed 801(d)(2)(D) into 801(d)(2)**(B)** and **(C)**, such that Croft and Fox would get the benefit of Fed. R. Evid. 801(d)(2) *only* for statements which they sought to present against the government which were *expressly authorized*—even dictated by––the supervising FBI agent in charge of the investigation, in a manner similar to Christof as he fed lines to the characters in the Truman Show.

Such a ruling is completely unmoored from the law. It directly contravenes not only Rule 801(d)(2) and its subpart **(D)**, but also the U.S. Supreme Court's decision in <u>Sherman v. United States</u>, 356 U.S. 369, 376 (1958), and this Court's decision in <u>United States v. Branham</u>, 97 F.3d 835 (6th Cir. 1996). Indeed, when entrapment is one of the issues being tried, the Supreme Court has not only held that a confidential informant is an agent of the government, but it has said that "at trial, ***the accused may examine the conduct of the government agent***," and the government is not permitted to "disown [its agent/informants] and insist it is not responsible for [their] actions." <u>Sherman</u>, 356 U.S. at 373 (citing <u>Sorrells v. United States</u>, 287 U.S. 435, 451 (1932) (emphasis supplied)).

By their *very nature*, non-authorized vicarious admissions by a government informant/agent will oftentimes be statements or conduct which the principal disapproves of, frowns upon, discourages, or flatly prohibits; rarely, if ever, will such admissions be "dictated" by the FBI's lead agent—in "Christof" fashion—into the informant's ear to be regurgitated to the defendants, and, if there *are* such statements, they do not need 801(d)(2)**(D)** to be admissible as non-hearsay admissions because they are squarely covered by 801(d)(2)(B) and/or (C). So long as the statement was made during the scope of the relationship and while it existed, 801(d)(2)**(D)** permits admission as substantive evidence against the government, and not merely for impeachment, *even if* the statement would be disapproved or was against directions; that is to say, *even if* Christof would be repulsed if he heard it:

> To be admissible as a non-authorized vicarious admission, the statement must relate to matters within the scope of the agent's duties. The principal, however, does not have to approve the

8

statement. Indeed, provided that the statement relates to a matter within the scope of the agency, it will be admissible ***even though contrary to the principal's interest, as party admissions often are***.

Anne Bowen Poulin, <u>Party Admissions in Criminal Cases: Should the Government Have to Eat Its Words?</u>, 87 Minn. L. Rev. 401, 462 (Dec. 2002) (emphasis supplied).[1]

The district court's order, with its allowance as 801(d)(2) admissions against the government of *only* those statements which were expressly "approved" or "dictated in stenographic fashion" by the principal as its self-authored and self-approved statements, had the prejudicial effect of enabling the government to "***disown*** [its agent/informants] and insist it is not responsible for [their] actions," especially at to **Plunk** and **Robeson**, but also **Chappel** too in large measure. And it denied Croft and Fox a meaningful opportunity to ***"examine the conduct of the government agent[s]*,"** as was central to their entrapment defense. <u>Sherman</u> guarantees an accused's right to "examine the conduct" of such "active government informers" (<u>id.</u> at 373)—which **Plunk, Robeson**, and **Chappel** all were, for all relevant times on and before October 7, 2020—not merely the conduct of the paid FBI employees who recruited, supervised, deployed, and rewarded those informer-agents. The district court, by effectively disabling 801(d)(2)(D) for this trial, permitted only the latter to some extent, and disallowed the former almost entirely.

As so understood, with the court's subject order disabling the defense from any reliance on 801(d)(2)(D), and thereby allowing defendants to use as "admissions" only those statements/texts/communications which satisfy 801(d)(2)**(B)** or **(C)**, the prejudicial impact of the district court's order was profound. It impacted the entire trial, of which the items from the spreadsheet are only examples.

Reviewing the 258 entries on the spreadsheet, the following chart depicts the communications, by item number as listed in the spreadsheet, whose admission as substantive evidence in support of defendants' entrapment defense was barred by the district court's erroneous ruling, with the items grouped into the relevant topics identified below as pertinent to that defense:

---

[1] Professor Poulin is a long-serving Professor at Villanova University School of Law, and she received her LLM from the University of Michigan Law School.

| Topics which the defense wanted to develop to help demonstrate entrapment | Items Numbers of relevant evidence |
|---|---|
| • **Chambers, Robeson, Chappel, et al.,** organized the Cambria and Luther FTXs and promoted them to the group, and they recruited attendance by Croft | 2, 19, 41, 45, 85, 87-89, 143 |
| • **Chambers, Robeson, Chappel** and other agents promoted and ran the Peebles event | 92, 93, 94, 96-100 |
| • **Chambers, Chappel**, **Robeson**, and other government agents engaged in a persistent and continuous push for "conspirators" to come up with a "plan" or "objective," and they pushed a plan | 11, 25-26, 29, 32, 34, 36, 46, 48, 58, 73-76, 81, 83, 89, 92, 98, 99, 100, 101, 118, 122-24, 132 |
| • **Chambers, Chappel**, **Robeson**, **Plunk**, and other agents engaged in continuous efforts to lead and guide thinking of "conspirators" about activities & goals, persuade them to be involved & vouching for Fox and/or his ideas | 7, 17, 21-22, 24-28, 39-41, 52, 57, 73-76, 80, 81-85, 89, 92, 96, 99-100, 104-14, 116-17, 119-20, 129, 131, 146, 157-61 |
| • **Chambers, Robeson**, **Chappel**, and other informants promoted availability of "free" money to help "fund" the group's goals | 20, 23, 24, 45, 55, 67, 90, 101, 103, 115, 118, 121 |
| • **Chambers, Chappel**, **Robeson**, **Chambers**, **Plunk** knew that other "conspirators" did not like/trust Croft and/or believed he was not interested | 8, 15 |
| • **Chambers** and **Chappel** planned, organized, promoted, and conducted the 8/29/20 drive-by of the governor's cottage and trip to Bull Tavern | 30, 31, 112-13, 115, 117-18, 129-30, 133, 228-33 |
| • **Chambers** and **Chappel** planned, organized, promoted, and conducted the 9/12/20 nighttime drive-by and the trip to the bridge | 1-5, 16, 32, 50-51, 53, 130, 135-43, 147-54, 161, 234-39, 241 |
| • **Chambers**, **Bates/Red**, **Chappel** etc. promoted the use of explosives including the FBI's "bomb" video | 27, 113-14, 119, 127, 128, 155-57, 158, 162-67 |
| • **Chambers, Chappel** pushed for action before "spring," and wanted events "sooner" | 45, 144 |
| • **Chambers**, **Chappel**, and **Bates/Red** planned, organized, promoted, and conducted the Ypsilanti ruse trip on 10/7/20 | 56, 162-67 |

By grouping into the above topics, Croft and Fox are best able to show the extent of the exclusions and to more effectively address their impact on Trial 2. These are *not* the only items of evidence which were barred and/or impacted by the trial court's ruling. Due to the district court's ruling, and its firm adherence to it in Trial 2, the accused defendants were forced to walk a tightrope at trial, whereby they were not permitted to utilize 801(d)(2)(D)-government admissions as the non-hearsay substantive admissions which, under the law, they are supposed to be. And, when admissions were contained in texts or in recorded communications (as many were, such as those in the spreadsheet at R. 383-1), the accused defendants were not permitted (with very limited exceptions, per the trial court's "Truman Show" rubric), to present the admissions to the jury as the admissions' "best evidence": <u>i.e.</u>, by, for example, admitting a paper copy of text messages, playing and admitting the recording, or admitting the document.

This limitation on the use of the government's 801(d)(2)(D) admissions was most dramatic with Steve **Robeson** and Jennifer **Plunk**, both of whom did not testify and, in **Robeson**'s case, invoked his Fifth Amendment rights not to do so. (TT2, PageID # 14737, 15537-38, 15811, 15820-21.) As such, the defense was denied the ability to use the admissions of **Robeson** and **Plunk**, as made to the alleged "conspirators" as part of **Robeson** and/or **Plunk's** efforts on behalf of the government to develop a "trusting relationship" with defendants, and the defense was likewise denied use of the admissions as revealed in communications between **Plunk** and/or **Robeson**, on the one hand, and the FBI employee-agents (**Chambers**, **Impola**, **Schweers**, etc.), on the other, who provided them with their directions. The same limitation was also very significant as to many of the substantive-evidence non-hearsay admissions by Dan **Chappel** even though **Chappel** *did* testify, and especially his texts and other communications with the alleged "conspirators" and his *responsive* texts and other communications with his FBI handlers (**Chambers** and **Impola**). (Under the court's Truman Show rubric, a number of the texts *written by* **Chambers** to **Chappel**, as directions to **Chappel**, were admitted as "authorized" statements per 801(d)(2)**(C)**, but not **Chappel's** responses to the FBI employee, and not **Chappel's** subsequent communications to the defendants, other than perhaps for impeachment but not as substantive evidence.)

Below are some examples of the government's 801(d)(2)(D) admissions which were excluded, or greatly limited, within some of the relevant topics noted above which were central to the accused defendants' entrapment defense, but which the district court sharply restricted. Following that, some examples are provided of the district court's strict limitation on the accused defendants using the 801(d)(2)(D)

11

admissions by or concerning **Robeson, Chappel,** and/or **Plunk**.

### 1. Chambers, Robeson, Chappel et al. organized and planned the FTXs and ran the Peebles event.

The involvement of the government informants in planning, organizing, and inviting attendees to the key events at which alleged "conspirators" supposedly hatched their "plans" was a critical aspect of the entrapment defense, especially when it was also the government's agents/informants who repeatedly suggested ideas and demanded "plans."

Croft only attended *four* events during the subject period from June 6, 2020 to the arrests on October 7/8, 2020—Dublin, Cambria, Peebles, and Luther; the government and its informants/agents were the promoters, organizers, orchestrators, and planners of all of them, and the level of their planning and their related hectoring for "plans" and "objectives" were unrelenting:

- **6/22/20, Robeson** Facebook post: "An event scheduled for the group is 'FTX Cross Train Multi-State'; July 11-12: Forge Rd. Cambria. WI hosted by Steve **Robey** Weekend event to include medical…live fire…range…kill house/with breach and entry stack…close quarters weapons protection…if time knife and hand to hand…lunch and dinner sat. and breakfast/lunch sun will be provided we are a family/community-oriented org. kids are welcome we have a huge pool and activities for them and day care on site…guns up long live the republic…or you can come the night before and set up camp or drive down sat early your choice…bring what you want to run with if you don't have weapons or want to train and run on something else we do have plenty but you have to pay for whatever ammo you run through." (R. 383-1, Item #85, PageID #2595.)

- **7/11/20, Chappel** texting with Agent **Impola** tells him that he got Croft to agree to come to the Luther FTX, which suggests that Croft did not make the decision on his own. **Chappel** tells **Impola**, "I have Croft coming to MI to train." (Id., Item #2, PageID #2576.)

The Luther event was not to occur until September, two months later; yet, **Chappel** and **Chambers** were already setting up the scam to be sure Croft would be there. They already had their pre-election timeline firmly in mind. They also aggressively promoted the Cambria, Wisconsin event, for the weekend of July 10-

12, 2020:

- 7/7/20, **Chappel** in audio communication: "So like Wisconsin is, I don't know what all went on in Ohio but there was basically some put out for feelers about... you guys can give your interpretation of it...of offensive training, that's what I was kind of getting a vibe on. Um, basically getting ideas for 'what if' kind of thing. So Wisconsin is going to be like mount training kind of thing, so like live fire capabilities, I don't know who's all going, I know there's a few states involved out of here, I'm going, Adam is going , the brothers are going ...right...I just want whoever's going to be open-minded to whatever they're going to  putting out there." (R. 383-1, Item #41, PageID #2588.)

That Cambria event, in fact, is the event for which **Chambers/Impola** sent **Plunk** to Delaware to be sure Croft made the trip, and, along the way, she stayed in the same hotel with Croft and his three young daughters. (Id., PageID #14857-62, 15427-28.) The statements made to Croft by **Plunk** during that trip were off limits by the judge's "Christof" ruling; nonetheless, **Plunk's** informant efforts toward Croft throughout that summer made Croft's girlfriend very uncomfortable because, to her perceptions, **Plunk** "most definitely" wanted "some sort of romantic relationship with [Croft]." (TT2, PageID #15187.)

Immediately after Cambria, **Chambers/Impola's** team of agents/informants were pushing their targets to be excited for the next FTX at Luther, and they were *keenly aware* of the required timeline for their planned scam, necessitating no delays in that timeline. That urgency is often apparent in these barred communications, particularly when the agents/informants are demanding "plans" and "objectives":

- 7/12/20, **Robeson**: "Let's set one up on in like 90 days...hey you guys ok with uh, going to Traverse City and spending on like 120 acres of land, private property? For a weekend? 3 months out? Can we set it up?" **Chappel**: 3 months out?" Garbin: "uh, no Wi-Fi or anything." **Chappel**: "Uh, We've gotta do it sooner." **Robeson**: "It's a weekend, you might have to take a Friday." **Chappel**: "**Steve** we've gotta do it sooner." (R. 383-1, Item #45, PageID #2589.)

The FBI and its agents/informants were also the driving force behind the Peebles event, set for July 18:

13

- 7/14/20: **Robeson** Facebook post re Peebles: "Founding Fathers call to action meeting sat the 18th in peebles ohio at 1pm. Need a head count for security reason thank you" (Id., Item #93, PageID #2596-97.)

- 7/18/20, **Robeson** running things at Peebles: "Okay, were going to do a round table now. We're going to start here with him. Everybody has the floor for a few, so we'll take three minutes. You can get a lot of information out in three minutes, if you stay on point. And then, ah, Frank, you can let everybody know you want. If that's what you need to come up with a plan to make it happen. I'll support you, mother fu****, I don't give a shit as long as it's a very viable plan." (Id., Item #92, PageID #2596.)

**2. Chambers, Chappel, Robeson, et al. engaged in a persistent and continuous push for "conspirators" to come up with a "plan" or "objective," and otherwise sought to lead and manipulate the group's thinking about activities & goals.**

The agents/informants used different techniques and language to gain trust and push their targets to have a "plan" and "objective," but their efforts in that respect were persistent and continued throughout the summer. These efforts also included suggestions about what the objectives should be:

- 6/6/20, **Robeson** at Dublin: "You can't just grab brick and mortar. Without a fuc**** human to go with it, you've done nothing but grab brick and mortar." (Id., Item # 73, PageID #2593.)

- 6/6/20, another CHS working with **Chappel** and **Robeson**: "You take brick and mortar and you've locked yourself down in one fuc**** spot and you've made yourself a fuc*** target. That entire team has just lost their fuc*** lives." (Id., Item # 74, PageID #2593.)

- 6/6/20, **Robeson**: [Unidentified]: "We did not leave that meeting with a plan." **Robeson**: "No we didn't, and I'm a little frustrated about that but what we do now know that we have to communicate – this group right here." (Id., Item # 75, PageID #2593.) "At this point, we have no plan!" (Id., Item # 76, PageID #2593.)

- 6/20/20, **Chappel**: "What is our goal? Are we just training for everything? What's the 'were trying to focus in on' because you can train for fuc****

14

everything, but if you want to have an endgame, that's what we need to deport our resources to." (Id., Item # 81, PageID #2594.)

The pressure by the agents/informants in the same way continued into July 2020, and for and during the Peebles and Cambria events that month, in tag-team fashion, with the agents/informants all aligned with their pressure tactics and with the lure of free funding from **Robeson's** 501(c) credit cards starting to be used as they got closer to the fall:

- 7/11/20, **Chappel**: "But also, like well what do you guys want to talk about, what are we trying to do? What's the mission right now?" (Id., Item # 89, PageID #2596.)

- 7/18/20, **Robeson** at Peebles: "Everybody thinks we got time to do this this and hang out and fuc**** sing kumbaya and all this other shit motherfuc**** in two months your states are going to be locked back down again. You mark my fuc**** words." (Id., Item # 100, PageID #2598.)

- 7/18/20, **Robeson** at Peebles: "And this right here, is why the fuc* I'm telling you, its being allowed by DeWine here, fuc**** shit face Whitface or whatever her name is there, Blackface fuc**** there...why are we not returning the same measure that we are being given? Why are we giving quarter when no quarter is being given. Motherf****** are going to throw shit at us why aren't we throwing shit back? Why are we not fuc****…This is why I am saying I agree with you 100%. This has to happen. I agree 100% with you guys. That shit ha to fuc**** happen. Because if not, this shit right here, is going to continue to kill us in our back fuc**** yard." (Id., Item # 96, PageID #2597.)

- 7/18/20, **Chappel** at Peebles: "We need to start working on something now. Hey this is the direction." (Id., Item # 98, PageID #2598.) "We have to leave here with a game plan, a direction." (Id., Item # 99, PageID #2598.)

- 7/20/20, **Chappel**: "Give me an objective or whatever you want to label that, as a goal, and then you got to circle back and because you can't do anything about obviously fundings, and Steve [**Robeson**] says, you know, Steve [**Robeson**] kind of sounds like he can help out with that avenue, with that 501 that they got." (Id., Item # 101, PageID #2598.)

15

There was a meeting of some of the Michiganders at Daniel Harris' house in Lake Orion, Michigan on August 5, 2020, an FTX at Munith, Michigan on August 9, and a Michiganders meeting with **Chappel** at Lake Orion on August 23. Croft was not invited to *any* of those events, but the pressure tactics of the informants/agents continued as did the coordinated promotion of free money from **Robeson**:

- 8/6/20, **Chappel**: "Well don't keep working on like, trying to get the pieces, we, we've got to have a goal to start working towards." (Id., Item # 122, PageID #2601.)

- 8/9/20, **Chappel**: "Oh yeah, but no. I think…I think instead of just putting it out there, hey we need ideas, just say, hey I need you to do this and you to do that." (Id., Item # 123, PageID #2601.)

- 8/9/20, **Chappel** at Munith FTX: "Well I think we need to start going up North. After the FTX I'll talk to Steve [**Robeson**] about getting that card at least checking it out, try to find out where the actual residence is just rolling through." (Id., Item # 118, PageID #2601.)

- 8/19/20, **Chappel**: "Yes, for if something goes south during election year, we already got shit in the work to, with protesters going up and stuff where it's. Because he's like, 'Hey we need to start doing this shit now.' He's like 'I'm done, tired of talking about it. We need to go ahead and start.' I'm like 'well whatever the fu** you want to do, you keep jumping around rom thing to thing to thing.'" (Id., Item # 124, PageID #2602.)

- 8/23/20, **Chappel**: "Because it's all coming down to what's you're line in the sand, If we don't have a plan. Then what's going to fuc**** happen. One by one that's what's going to happen." (Id., Item # 29, PageID #2586.)

- 8/28/20, **Chappel**: "That's literally all the way like a movie, because some of them, they start the movie off with the other part. So we need to have an end part, objective, mission, whatever you call it. But everybody knows it, and then, hey now we're training for it. We're not just going to show up for training okay, we're working on a land nav today. Why would you even work on that? Well, because it's a mission statement, like an op, alright? Where you strategize and attack. We're going to do this a little bit here, do this a little bit there. Hopefully, it comes together." (Id., Item # 132, PageID #2603.)

16

**3. Chambers, Chappel, Robeson, and Plunk knew that other "conspirators" did not like/trust Croft and/or believed he was not interested, which they had to overcome.**

The barred 801(d)(2)(D) communications revealed that **Chambers'** team of operatives were fully aware that the Michiganders disliked Croft and that Croft was not engaged with or interested in their "plans." **Plunk** and **Robeson** reaffirmed their plans, within the scope of their roles on **Chambers'** team, to "do what we got to do" to overcome that.

- **Chambers** tells **Chappel** that people are getting nervous with Croft. (R. 383-1, Item # 8, PageID #2578.)

- 8/7/20, **Robeson** tells **Plunk** that Croft might not "have the stones to do it, because I don't know, I haven't really talked to him and I don't know where he's really at, but I just know that backing off as hard as he has from other stuff, I have concerns with." **Plunk:** "Well, I think the whole, them saying that they seen the feds there in Ohio, that we can freak the fuc* out at him and he just... That's when it changed." **Robeson:** "But here's the real fuc**** ideal of that. If you think the feds ain't watching everything we fuc**** do anyway, you're nuts." **Plunk:** "So who gives a fuc*? Let's do what we got to do." (R. 383-1, Item # 15, PageID #2579.)

This coordination with and among **Chambers'** team of operatives was apparent throughout August and September 2020, as the team was getting closer to its deadline for a pre-election takedown. The illegalities which were tolerated and encouraged in the **Chambers** team's farcical episode to set up Croft with the weapon from the Cambria FTX are emblematic of both the team's close coordination and its collusion to get these men by doing "whatever we got to do":

- 9/12/20, call between **Chappel** and **Plunk**: **Plunk**: "[FBI's] Corey [Baumgardner] says we are a team. If he wants, I'll take it if he wants me to." (R. 383-1, Item # 145, Page #2605.) "[M]y understanding was that Wisconsin was, he had three rifles like that. And he was leaving one for each state. That's how he was…this one was going to stay in Wisconsin. And he was even putting out up there right now that he didn't he doesn't want to work this stuff. He's too old. This that and the other. I want, I get that Corey if he wants to come with the funds and get this stuff, then yeah

why not? Why not put it down to the younger guys that can…more aptitude to run a platform." (Id., Item # 146, PageID #2605; see also Croft Brief at pp. 41-42.)

**4. Chambers and Chappel planned, organized, promoted, and conducted the 8/29/20 and 9/12/20 drive-bys of the governor's cottage and related events.**

Critical to the entrapment defense was being able to ***show*** the jury all the many communications by and among **Chambers**' operatives—**Robeson, Plunk, Chappel**—where they are instigating the critical events alleged to prove their scammed-up "conspiracy," including their coordination and their willingness to engage in inducement via illegal activity, "whatever it takes," and not being "above doin anything that has to be done brother." This manifested in the coordinated efforts by **Chambers** and his **operatives** to plan the government-produced drive-bys of the governor's cottage on 8/29/20 and 9/12/20, and to ensure their targets were present in the cars for those events.

- 8/9/20, **Chappel** at Munith FTX,[2] pushing the cottage location: "Where's her place in Traverse City? Or wherever she has her boat, somewhere where she had her guard down." (R. 383-1, Item # 112, PageID #2600.)

- 8/9/20, **Chappel** at Munith FTX, suggesting the use of explosives with the bridges: "Well then you are going to have to find a second location. We'll have to send at least one or two guys up there to check routes, check roads, any traffic construction, highway stop sign, traffic lights, overhead bridges, shit like that." (Id., Item # 113, PageID #2600.)

- 8/9/20, **Chappel** at Munith FTX, suggesting the use of explosives: "If you don't want to kill anybody or anything or you don't want her to be there find out number 2, get some Tannerite, put a dent in her house – or her driveway, fix your fuc**** roads, how about that?" (Id., Item # 114, PageID #2600.)

---

[2] Croft was not invited to or present at the Munith FTX, nor was he invited to or present at the vast majority of the Michiganders' events and all of their "chats."

18

- 8/9/20, **Chappel** at Munith FTX, promoting **Robeson's** free money scam under 501(c) to buy any supplies: "If Steve [**Robeson**] will give us that card for funding would you be down with going up North to check that place out?" (Id., Item # 115, PageID #2600.)

- 8/9/20, **Chappel** at Munith FTX: promoting other crimes, "whatever we got to do": "If you want to let them know that you are there all right, find out number 2 [a reference to the cottage], which is the actual structure, her place, she's down in session okay, put a dent in her house you know. Or her fuc**** boat, can't take it out if the motherfuc**** sunk." (Id., Item # 117, PageID #2601.)

- 8/9/20, Chappel at Munith FTX, promoting **Robeson's** free money scam to buy any supplies: "Well I think we need to start going up North. After the FTX I'll talk to Steve [**Robeson**] about getting that card at least checking it out, try to find out where the actual residence is just rolling through." (Id., Item # 118, PageID #2601.)

- 8/28/20, **Chappel** to **Chambers** (text): "Would you want 2 trips or wait till we get more guys?" (Id., Item # 130, PageID #2602; R. 666-1, PageID #8482.)

- 8/29/2020, **Chappel** and **Chambers**, wherein **Chambers** pushes Chappel to get Brandon Caserta to go on the August 29 ride along. (Id., Item # 31, PageID #2586.)

The operatives started their planning of their 9/12/20 drive-by operation immediately after their 8/29/20 operation. They'd already decided on this 2nd trip, but wanted to be sure **Chappel** set it up to make it look like Fox wanted the trip:

- 8/31/20, **Chappel**: **Chappel** tells Fox that he should bring Croft and **Robeson** in on the night op during the Luther FTX, saying "lead is better than silver," referencing Croft's plan to mint silver. (Id., Item # 1, PageID #2576.)

- 8/31/20, **Chappel** text to Fox: "Any idea for night at FTX[.] Place looks different at night[.] Were planning for a night op right? Night recon[.] Field trip 0 dark 30 bring in the boys be going[.] Night vision all that shit[.] I got

19

it so does 3 others[.] Will do it that night[.] We got everyone there." (<u>Id.</u>, Item # 135, PageID #2604.)

- 9/3/20, **Chappel** text to Fox: "Im just turning that mission prep switch on[.] So lets plan night recon with them and ours." (<u>Id.</u>, Item # 138, Page ID #2604.)

- 9/4/20, **Chappel** text to Fox: "What about other members and detail team. Gonna effect ftx[.] Yeah like we need train and prepare and train again[.] If youre taking my collar off om gonna wreck shop." (<u>Id.</u>, Item # 142, PageID #2604-05.)

- 9/4/20, **Chappel** text to Fox: "Im just treating FTX like an actual op[.] take our no shit guys and run em through." (<u>Id.</u>, Item # 143, PageID #2605.)

The trip "up North" on 9/12/20 would *never* have happened but for the aggressive actions by **Chambers** and his operatives **Bates/Red**, **Chappel**, **Robeson**, **Plunk**, and **Schweers**:

- 9/12/20, **Chappel** to Fox: "And then if we take that trip up north...still down for that this weekend?" (<u>Id.</u>, Item # 50, PageID #2590.)

- 9/12/20, **Chappel** and **Robeson**, egging Fox on to go on the trip: "you're Michigan's Guy," "who do you want?" (<u>Id.</u>, Item # 53, PageID #2590.)

- 9/12/20: **Chappel** to Fox: "Who do you want to talk about going up north tonight?" Fox: "Me, you." **Chappel**: "Want to take **Red**, [**Schweers**], Eric?" Fox: "Me, you, Red, Mark, Barry." **Chappel**: "That's it." (<u>Id.</u>, Item # 51, PageID #2590.)

So involved were **Chambers**' operatives in planning the 9/12/20 drive-by event to set up Croft and Fox that they worked on the *seating arrangements* in advance. They wanted to be sure Croft and Fox were together in the operatives' car so the two targets could be induced by **Chambers'** operatives to say things to be used against them to help the government mislead the eventual jury about whose idea this all was:

- 9/12/20, **Chappel**: "What we'll do is, you guys drive up there too." **Robeson**: "Yeah." **Chappel**: "So then we don't have to drive all the way

20

back down here to drop you guys off." **Robeson**: "That's right." **Chappel**: "To go all the way back up. And then we link up with them, we'll split it up and just take two trucks." **Robeson**: "When we split…when we get with them, I want to, if everybody's scanned, I want one of your gun fighters. And can you ride with him." (Id., Item # 147, PageID #2605-06.)

- 9/12/20, **Chappel** and **Robeson**: **Robeson** tells **Chappel** that he wants a "gunfighter" in their car, and he wants Fox and Croft in the car with them so they can "chop shit up." **Robeson** decides that he wants his car to be him, **Chappel**, Fox, Croft, and **Bates/Red** [which is, in fact, what occurred, see Croft Brief at p. 23]. **Robeson** tells **Chappel**, "We'll put Barry and Adam together." (R. 383-1, Item # 3, PageID #2576.)

They knew that Croft was not likely to want to leave his hotel, and they strategized about how they could get him to come along on the **operatives**' drive-by event and overcome any objections by Croft and his girlfriend to going out with them that night:

- 9/12/20, **Chappel**, **Robeson**, and **Plunk**, with reference to Croft and his girlfriend: **Robeson**: "Does he know about it yet?" **Chappel**: "No that's for you." **Plunk:** "What did you just say?" **Chappel**: "Can he come and her not tonight?" **Plunk:** "No." **Robeson**: "Can he come what?" **Plunk:** "Because she won't let him go." **Robeson**: "Well he can come tonight." **Plunk**: "But what he's saying is will she stay and let him go." **Robeson**: "He ain't got no choice. She ain't got no choice. Yeah, if either way he's going to go with us and she can't that's what's up, period." (Id., Item # 151, PageID #2606.)

- 9/12/20, between **Bates/Red** and **Chappel**: **Red** asks if everyone knows what they are going to be doing. **Chappel** says yes and admits that he has been telling Adam and **Robeson** to push it to the guys. **Bates/Red** asks **Chappel**, "When we leave, are these folks aware of where we're going, or no?" **Chappel** replies, "Adam's going to push downtown. [**Robeson**]'s all about it. That's when I told him, 'Hey, what we're going to do is put people out here, you need to put this out to the rest.'" (Id., Item # 16, PageID #2580.)

- 9/12/20, between **Bates/Red, Chappel**, **Robeson**, Fox, Croft: **Bates/Red** asks the occupants of the vehicle: "All right, fellas, where the fuc* we

going?" Croft: "Destination unknown. Destination unknown." (Id., Item # 4, PageID #2577.)

**Chambers'** operatives strategized about how to be sure one of the targets acquiesced in the **operatives'** plan on 9/12/20 to also look at the bridge and take a picture there:

- 9/12/20, between **Bates/Red** and **Chappel: Chappel** asks if **Red** wants him to drop him off and flip back around. **Red** says that he wants Croft to come with him. **Chappel** asks if he wants to take Fox too and **Red** agrees. Fox and **Bates/Red** go under the bridge and **Bates/Red** tells Fox to make sure that he has his phone so they can take pictures. **Chappel** asks **Red**, "You want me to just drop you. . . flip a bitch and come back around?" **Red** responds, "Me and Barry." Eventually it ends up just being **Bates/Red** and Fox, and **Red** tells him, "Make sure you have your phone or something to take a photo. . . when we get under there." (Id., Item # 5, PageID #2577.)

### 5. Chambers, Bates/Red, Chappel and others promoted the use of explosives including with the FBI's "bomb" video.

Every aspect of the "plan" originated with and/or was aggressively pushed by **Chambers** and his operatives, including the use of explosives:

- 8/9/20, **Chappel** at Munith: "Well then you are going to have to find a second location. We'll have to send at least one or two guys up there to check routes, check roads, any traffic construction, highway stop sign, traffic lights, overhead bridges, shit like that." (R. 383-1, Item # 113, PageID #2600.)

- 8/9/20, **Chappel** at Munith: "If you don't want to kill anybody or anything or you don't want her to be there find out number 2, get some Tannerite, put a dent in her house – or her driveway, fix your fuc**** roads, how about that?" (Id., Item # 114, PageID #2600.)

- 8/9/20, **Chappel** at Munith: "If you want to do brick and mortar okay, put some Tannerite in there and fuc***' blow her door down. Then you can't be touched. You know." (Id., Item # 117, PageID #2600.)

- 8/23/20, **Chappel**: "I'm a kind of... Him and haw about it. Adam wants to

22

make things go boom and whatnot. And I know Beaker [Daniel Harris], you had a guy that was supposed to come up, I'm in touch with one of my... He was in a ranger vat for 16 years. He does like what I do but on steroids. As far as firearms training, he goes around the country he does security work. He's got shit. And he'll come up to the FTX and he's going to be in town." (Id., Item # 27, PageID #2585.)

- 9/15/20, **Chappel/Chambers** text: **Chambers** tells **Chappel** to double the ingredients in an explosive recipe for an unindicted individual. (Id., Item # 33, PageID #2587.)

- 9/15/20, **Chappel** text to Fox, pushing the **Chambers'** scam, leading up to October 7, to get Fox to express interest in **Bates/Red's** explosives that the operatives featured and promoted at Luther: "[**Bates/]Red** hit me this morning 3900 for everything." (Id., Item # 156, PageID #2607.)

**6. Chambers, Chappel pushed for action before "spring," and wanted events "sooner."**

The operatives had their **Chambers'** directed timeline, and they pushed it to disallow any delays:

- 7/12/20, call between **Robeson**, **Chappel**, Garbin: **Robeson**: "Let's set one up on in like 90 days...hey you guys ok with uh, going to Traverse City and spending on like 120 acres of land, private property? For a weekend? 3 months out? Can we set it up?" **Chappel**: "3 months out?" Garbin: "uh, no Wi-Fi or anything." **Chappel**: "Uh, We've gotta do it sooner." **Robeson**: "It's a weekend, you might have to take a Friday." **Chappel**: "**Steve** we've gotta do it sooner." (Id., Item # 45, PageID #2589.)

- 9/11/20, **Chappel** and Fox: **Chappel**: "I know you mentioned Spring and shit. think we're not going to have that long." (Id., # 144, PageID #2605.)

**7. Chambers, Robeson, Chappel, and other agents promoted availability of "free" money to help "fund" the group's goals and they encouraged and/or tolerated other illegal/unethical activities in luring the targets into the FBI's trap.**

The promotion of the **Robeson** free money gimmick, with the purported

23

501(c)(3) credit cards, was a constant tactic by the agents/informants. It further confirmed that the FBI and its agents/informants were all working together from the same **Chambers/Impola**-directed playbook, that they were pushing the same timeline with the same objectives, that the "plans" originated with them to fit their objectives of setting the defendants up for an arrest before the election, and that they tolerated and encouraged unethical, if not illegal, activity by agents/informants in luring the men along:

- 7/20/20, **Chappel**: "Give me an objective or whatever you want to label that, as a goal, and then you got to circle back and because you can't do anything about obviously fundings, and Steve [**Robeson**] says, you know, Steve [**Robeson**] kind of sounds like he can help out with that avenue, with that 501 that they got." (Id., Item # 101, PageID #2598.)

- 7/27/20, **Chappel**: "Steve [**Robeson**] going to get that card I don't know if he's going to give it to you or if you want to delegate that down to like myself or something we could do that. You have a $1000 on a card or $5000 on the car, that-that's enough for – get a rental vehicle. We can get a hotel outside of our – our income." (Id., Item # 103, PageID #2598.)

- 8/9/20, **Chappel** at Munith FTX: "If Steve [**Robeson**] will give us that card for funding would you be down with going up North to check that place out?" (Id., Item # 115, PageID # 2600.) "Well I think we need to start going up North. After the FTX I'll talk to Steve [**Robeson**] about getting that card at least checking it out, try to find out where the actual residence is just rolling through." (Id., Item # 118, PageID # 2601.) "I mean I'm sure if you reach out to Steve [**Robeson**] if he can expedite a card over here and we can get that avenue done…from my understanding that's how they got them 300 Blackouts with the suppress on it and them .37 millimeters." (**Id.,** Item # 121, PageID #2601.)

- 8/16/20, **Chappel** to Caserta: "Because when it boils down to, like Steven [**Robeson**] from Wisconsin, has credit card for us, probably going to get it in September and can fund. So, 'you want to get this stuff? Okay, go ahead and do it.' Okay [inaudible 00:23:23] we're doing this." (Id., Item # 20, PageID #2582.)

- 9/12/20, **Robeson**: "And its all tax write offs the way we do it for anybody that does it. And what we do is we created a 501(3)(c)." (Id., Item # 55,

24

PageID #2591.)

The 801(d)(2)(D) recordings also showed that the agents/informants **Chappel**, **Robeson**, **Plunk** were working closely together and coordinating their efforts against the "targets" including in recorded phone calls to which **Chambers/Impola** had access and/or listened to in real time. They discussed in these calls their "inducement" of illegal activity and that doing so may be necessary:

- 9/17/20, recorded call with **Chappel**, **Robeson**, **Plunk**: [**Robeson**]: "I am not going to induce any fuc*** illegal activity that we don't have to. Okay, I'm not above doin anything that has to be done brother, period. 100% till the fuc**** wheels fall off." (Id., Item # 158, PageID #2607.) "Last thing I want is any of us getting jammed up on just a storytelling, you know what I mean?" (Id., Item # 159, PageID #2607.) "I'm not going to, certainly not going to put your boy in that spot, Dan [**Chappel**], you know what I mean? That's absolutely unnecessary verbage for him to even consider it as far as I am concerned. We're supposed to be insulating him." (Id., Item # 160, PageID #2607.)

**Chambers**, of course, applauded this sleaze-infested phone call of his chosen operatives:

- 9/17/20, **Chambers** to **Chappel**: "Good call with Steve [**Robeson**] and jen [**Plunk**]." (Id., Item # 157, PageID #2607.)

That coordination and collusion, and the openly-admitted toleration of illegal or unethical activities as may be necessary—in the judgment of the likes of **Robeson**, as squarely within his government-informant duties—to induce the "targets" to fall for the scam being run against them by these overzealous government agents, only highlights how wrong it was for the trial court to bar the defense from presenting the evidence about **Robeson**'s later firing from the **Chambers** team and the reasons for that firing as revealed in the Defense Exhibits that were presented to the district court, but which the court disallowed, i.e., Exhibits 1041 and 1042. (TT2, PageID #15808-17, 15904-06.)

Those documents make clear that the FBI's discharge of **Robeson**, for cause, on November 17, 2020, was in large part for conduct which **Chambers, Chappel,** et al. were fully aware of, encouraged, and participated in throughout **Robeson's** activities as one of **Chambers**' key operatives in this case:

[**Robeson**] was a noncompliant informant and an unreliable declarant. As with all informants, before cooperating with the FBI, he agreed to a number of rules and terms. Those included following agent direction, not committing unsanctioned crimes, candid disclosure to his handling agents, and others. [**Robeson**] violated those rules, ending his cooperation and relationship with the FBI. His violations included the following undisclosed and unauthorized acts:

- **offering use of 501(c) charity funds to purchase weapons for attacks;**

- **obtaining and possessing weapons while prohibited from doing so because he was a felon;**

- **offering personal equipment, like the use of a drone, to aid in acts of domestic terrorism.**

[**Robeson**] also failed to record, and to disclose the presence of existing recordings of, pertinent conversations and events.

(Proffered Defense Exh. 1042 at pp. 9-10 (emphasis supplied); see also R. 396, USA Response to Defendants' Motion in Limine Regarding Admission of Out-Of-Court Statements at pp. 9-10 (PageID # 2728-29).)

[**Robeson**] has a lengthy criminal history within the U.S. [**Robeson**] was previously arrested and served prison sentences for theft, forgery, receipt of stolen property, fraudulent insurance claims, bail jumping, and various other misdemeanors. These arrests spanned the period of 1984 through 2008. . . .

At several times throughout the relationship with [**Robeson**], he did not always properly follow the instructions provided by the Handling Agent. In addition to failure to follow instruction, [**Robeson**] also failed to check with Handler prior to taking action. This action caused considerable problems that had to be addressed. . . .

[**Robeson**] was directed to be a sponge during conversations with

subjects of interest. However, frequently, [**Robeson**] could be heard taking control of conversations and providing a lot of input. [**Robeson**] appeared to enjoy the role of being a person in charge, and relishes the respect and admiration of their peers. At times, [**Robeson**] can be heard embellishing their deeds, background, and abilities in order to ingratiate themselves with the subjects. It was hard to determine at times if this was to increase his bona fides or for his own ego or if [**Robeson**] was working to steer the investigations. . . .

[**Robeson**] had excellent access, however, he was difficult to handle and did not always follow the directions provided by the FBI. As a result, [**Robeson's**] motivations, truthfulness, and dedication to assisting the USG were called into question.

(Proffered Defense Exh. 1041.)

**Chambers** and his team of operatives were all perfectly willing to tolerate, even praise—<u>e.g.</u>, "Good call with Steve [**Robeson**] and jen [**Plunk**]"—**Robeson's** lawless attitude toward his duties, and his 501(c) scam, so long as it helped them achieve their pre-November 2020 goal of big splashy arrests. But, when they now had to worry about *a jury trial*, and the problems which **Robeson** would cause with the jury, they took the approach which <u>Sherman</u> forbids in entrapment cases: they sought to "disown [**Robeson**] and insist[ed] [they are] not responsible for [his] actions," and to deny Croft and Fox a meaningful opportunity to "examine the conduct of the government agent[s]." <u>Sherman</u>, 356 U.S. at 373.

### 8. Chambers, Chappel, and Bates/Red planned, organized, promoted, and conducted the Ypsilanti ruse trip on 10/7/20.

The denouement was planned by **Chambers'** operatives to occur before November 2020, which explains all their collusive shenanigans to get all their pieces in place in September and October, including with their inducements at Luther, their deployment there of **Bates/Red's** bomb video and the coordinated promotion by the **Chambers** team of **Bates/Red's** "explosives" work, and their scammed up 10/7/20 trip to Ypsilanti for the "free" gear:

- 9/26/20, **Chappel** to Fox: "**Red** is gonna be in state for a quick few on the 7. (Goin from one training spot to the next) he had some extra gear that he

27

acquired and is offering up some to us. He also has a few for you has 1 know 1 for sure gonna try for a few flash bangs[.] Also wants to go over options for cakes, i.e. (backpack Emoji) or (toolbox Emoji) things like that." (Id., Item # 162, PageID #2608.)

- 9/27/20, **Chappel** chat: "Oct 7 red will be in the area (Ypsilanti). He has some gear he acquired from previous training told him will take anything. Has a plate carrier few med kits couple drop legs. Also wants to discuss things for ftx i.e. size and options for concealment." (Id., Item # 163, PageID #2608.)

- 9/29/20, **Chappel** chat: "For the meeting with **red** since he's bringing us some gear think we should ____ some $ at him for making the pit stop and towards ftx?" (Id., Item # 164, PageID #2608.)

- 9/30/20, **Chappel**: "I think it is more of a good faith for him. He's not expecting anything so I think when we present it to him it's like, you know, he'll probably be like, well, hey f***, like cool thanks you know. I mean, I would do the same you know. And then it's kind of like hey you know, you're doing us a solid. Because like you said, he's bringing I think he's got a couple flash bangs, it's like because there was a bunch of gear that – from the last training event that he had after our FTX." (Id., Item # 167, PageID #2608-09.)

- 10/1/20, **Chappel** and Harris (text): "**Red** will be passing through down by Ypsilanti near 94. Gonna have some gear to drop ie med kits plate carrier couple drop legs. People left em at his last training. Figure get that and some bds or something." (Id., Item # 56, PageID #2591.)

**9. Some examples of the court's ruling in action as applied to 801(d)(2)(D) admissions by or about non-testifying government agents Chappel, Robeson, and/or Plunk.**

The court strictly enforced its "Christof" rule. Many examples exist, most frequently when it came to the statements by the agents/informants **Chappel**, **Robeson**, or **Plunk**, and those agents/informants' respective efforts to utilize their own judgment—as was squarely within the scope of their assignments in and during the matter, and thus in the wheelhouse of 801(d)(2)(D)—to curry favor with and gain trust of "conspirators" and push the plans dictated by **Chambers and the FBI**:

28

Q Steve [**Robeson**] ran the meeting, did he not?
A I remember him talking in the beginning of the meeting. Yes.
Q Do you remember him doing like a round table, telling people they would have a certain amount of time to speak?
A Yes.
Q And talk about their ideas?
MR. KESSLER: I am going to object to hearsay.
THE COURT: Once you start to get into contents you are into hearsay.
MR. GIBBONS: I think it's general direction, Your Honor. I am not asking for a specific --
THE COURT: It's content. It's a sustained objection.

(TT2, PageID #14583-84.)

This happened frequently in Trial 2, with some more examples below. It also happened repeatedly in Trial 1. (See, e.g., TT1, PageID# 11203, 11247, 11252, 11296-97, 11323-34, 11404, 11849-50, 12437-38, 12665, 12718, 12731, 12747-50, 12828, 12924-25, 12956, 13390, 13491-92.) The district court's "Christof" rule was very clear to the litigants. The ability of Croft and Fox's attorneys to conduct the trial of their defense case, and to use the government's admissions such as detailed above to help tell the story of the government's overreach and entrapment, was interfered with by the court's ruling. When the defense tried to go into those areas, the objections were made and sustained, with distracting delays. The message from the court that those matters were off-limits was unmistakable:

Q Okay. Do you have an understanding that Steve **Robeson** is the commanding officer for the Wisconsin Patriot Militia?
MR. KESSLER: Your Honor, I am going to object. This is a very circuitous way of getting in hearsay.
THE COURT: Well, if he has an understanding from some source he can get to it, but yes, if he is just going to be asked to recite things he may or may not have heard on those tapes that's the hearsay problem on this side of the case.

(TT2, PageID #14760.)

Q You also have an interest in making sure you understand who is

who and what's what and where things are going, right, when you
are in an investigation?

A Yeah. I would say that's correct. I want to know where the
individual is taking us, for sure.

Q Okay. What was your understanding of Steve **Robeson's** role at
these meetings?

**MR. KESSLER: It's based on listening to Steve Robeson's
words. It's hearsay, Your Honor.**

**THE COURT: It's the same problem.** . . . The problem is, you are
trying to get around the ruling pretrial and I am not going to let you
do that.

(TT2, PageID #14761-62.)

Q You have followup contact the next day, true?

A True.

Q And you had that contact with Dan **Chappel**, correct?

A Correct.

**Q Dan Chappel sends you text messages, right?**

**A Yes.**

**Q And --**

**MR. KESSLER: Hearsay.**

MR. GIBBONS: I am not going to get into that, Your Honor. I am
walking around it.

THE COURT: Okay. Let's get to the next question then. We'll see
where we go.

(TT2, PageID #15598-99; <u>see also</u> PageID # 15338-40, 15601.)

Q Do you know if it came back into the possession of an informant
working for the FBI?

A No, sir.

Q Do you know what happened to the weapon after you gave it to
Steve **Robeson**?

A I know what Mr. **Robeson** told me happened.

Q Well, I can't get into the hearsay. Do you know who next had the
weapon after Mr. **Robeson**?

A I have no direct knowledge of that, sir. No. I did not interact with
that rifle ever again.

(TT2, PageID #16114.)

**C. The court's order barring the 801(d)(2)(D) admissions was not harmless. This was a very close case; Appellants would likely have been acquitted if 801(d)(2)(D) was properly applied.**

As addressed in Croft's main brief, and largely ignored by the government, the district court's rulings which denied Croft and Fox their right to use 801(d)(2)(D) in mounting their entrapment defense is an error of *constitutional* dimension. (Croft Brief at 2, 28, 55-56.) This was not merely an error wherein the court made an occasional trial "mistake" in its application of 801(d)(2)(D) to admit, or not admit, particular pieces of evidence. Here, by contrast, the district court effectively removed 801(d)(2)(D) altogether from the arsenal of federal evidence rules that were available *to the defendants* in their trial (by collapsing 801(d)(2)(D) into (B) and (C)), while, at the same time, fully enforcing against the defendants, and for the government's benefit, the co-conspirator non-hearsay rules of 801(d)(2)(E).

The district court's error is a constitutional error because it denied defendants their right to a fair trial in accord with fundamental standards of due process, wherein the jury, in considering Fox and Croft's entrapment defense, would be able to "examine the conduct of the government agent[s]." Sherman, 356 U.S. at 373; Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."). Instead, the district court's error facilitated the government's tactics to "disown [its agent/informants] and insist it is not responsible for [their] actions," Sherman, 356 U.S. at 373, and disallowed *entire categories* of government admissions which would have helped Croft/Fox demonstrate the entrapment. Because the court's repeated error significantly affected Croft and Fox's constitutional right to present their entrapment defense, the error is, at the very least,[3] subject to Chapman's harmless error standard under which the government must

---

[3] As addressed in Croft's main brief (at pp. 2, 55, 72-73), the error should be treated as structural error. The error "infect[ed] the entire trial process," Brecht v. Abrahamson, 507 U.S. 619, 630 (1993), and it "necessarily render[ed the] trial fundamentally unfair." Rose v. Clark, 478 U.S. 570, 577 (1986). But even if the Court disagrees, the error is one of constitutional magnitude which requires the government to prove harmlessness under Chapman's beyond-a-reasonable-doubt standard.

31

prove the error to be harmless "beyond a reasonable doubt." See Chapman, 386 U.S. at 24; Neder v. United States, 527 U.S. 1, 15-16 (1999). See also United States v. Kettles, 970 F.3d 637, 643 (6th Cir. 2020) ("the government's burden for constitutional errors is 'considerably more onerous' than its burden for non-constitutional errors") (cited in Croft's main brief at p. 55).

For this constitutional error to be harmless, the Government is required to establish, to the satisfaction of this Court beyond a reasonable doubt, "that a rational jury would have found the defendant guilty absent the error." Neder, 527 U.S. at 18. There must be proof beyond a reasonable doubt "that the error complained of did not contribute to the verdict obtained." Chapman, 386 U.S. at 24. "Harmless beyond a reasonable doubt" is an "exacting standard indeed." Ellis v. United States, 941 A.2d 1042, 1048-49 (D.C. App. 2008). "The properly admitted evidence against the defendant must be 'overwhelming.'" Id. The "inquiry [under Chapman] . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279 (1993) (emphasis added).

Moreover, as noted at the outset, reviewing courts are particularly reluctant to find that the government has met its harmlessness burden when the subject trial error resulted in *barring* evidence which would have helped to establish the defendant's affirmative defense. See, e.g., Corona, 41 Fed. Appx. at 34 (error was not harmless because the informant's statements were probative on the issue of government inducement and the error prevented Corona from supporting his claim of entrapment); Harris, 733 F.2d at 1005; Kohan, 806 F.2d at 22; Carter, 491 F.2d at 630; Peak, 856 F.2d at 834; Evans, 728 F.3d at 967.

When the defendant's guilt was "genuinely contested," and there is evidence upon which a jury "could have reached a contrary finding, the error is not harmless." United States v. Rhynes, 218 F.3d 310, 323 (4th Cir. 2000) (en banc). Thus, even though the reviewing court may have found that the evidence at trial satisfies the much lower sufficiency-of-evidence standard under Jackson v. Virginia, 443 U.S. 307 (1979), *that does not mean the evidence also satisfies the considerably more stringent standard for determining harmless error*. Mere sufficiency of the evidence does not dictate a finding of harmless error, particularly where the government's evidence was not overwhelming. In cases of "genuinely contested" guilt, and lack of overwhelming evidence, reviewing courts must be "less tolerant of the idea that errors committed during the trial of [the] case are acceptable because

they are harmless." <u>United States v. Ignasiak</u>, 667 F.3d 1217, 1236-37 (11th Cir. 2012). <u>See also</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 696 (1984) ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"); <u>United States v. Molt</u>, 615 F.2d 141, 145-46 (3rd Cir. 1980) ("Of course, the closer the case, and the more important and persuasive the evidence wrongfully admitted or excluded, the less likely it is that a court will find the error harmless."); <u>United States v. Bell</u>, 516 F.3d 432, 448 (6th Cir. 2008) (concluding error was not harmless where evidence was not overwhelming); <u>United States v. Haywood</u>, 280 F.3d 715, 724-25 (6th Cir. 2002) (finding, where defendant's "guilt was significantly contested," error was not harmless even though the "government offered sufficient proof" of guilt).

Even assuming, *arguendo*, the error here is treated merely as a *non-constitutional* trial error in admission of evidence as in <u>Kettles</u> (which Appellants dispute), the error is still not harmless. The government, even in that event, still cannot meet its harmlessness burden to show—by a preponderance, under that standard—that the error did not affect the trial's outcome and/or the record of this case does not provide this Court with "fair assurance" that the verdict was not "substantially swayed" by the error. <u>Kettles</u>, 970 F.3d at 643-45; <u>United States v. Agrawal</u>, 97 F.4th 421, 429 (6th Cir. 2024). <u>See also</u> <u>Kotteakos</u>, 328 U.S. at 65.

This was a *very close* case, one in which Appellants believe the government failed to even meet the <u>Jackson</u> standard as to the counts which charged the alleged "conspiracy." <u>See</u> Croft's Brief at pp. 2, 29-42. The same error of constitutional dimension, by which the trial court in Trial 2 applied a "Christof" rule to effectively eliminate the government's many admissions under 801(d)(2)(D) from Croft and Fox's arsenal for demonstrating reasonable doubt, also occurred in Trial 1. Two of those Trial 1 defendants were nonetheless acquitted outright, and the jury in that trial was unable to reach verdicts as to Croft and Fox. With a proper application of 801(d)(2)(D) in *Trial 2,* one which respected defendants' rights to due process and a fair trial, there is a reasonable probability the result in Trial 2 would have likewise been acquittals because the government's admissions at issue, had they been admitted for the jury's consideration, were strongly supportive of Croft and Fox's entrapment defense. They would have placed the case in an entirely different light, with the many substantive-evidence and non-hearsay examples—in the written and/or spoken words *of the agents-informants' themselves*—to show the **Chambers** team's close coordination and collusion; their aggressive strategizing to exploit their targets' vulnerabilities and to overcome them; their incessant inducements at every key step of the way, to and including the Ypsilanti arrests on October 7; and their

cavalier use of unethical if not illegal acts to ensnare their targets, and only taking action *against* such behavior *after* its benefits had already been reaped and despite the **Chambers'** team's promotion and encouragement of it while it was occurring.

These conclusions of non-harmlessness are further compelled when the barred 801(d)(2)(D) admissions are viewed through the lens of what Croft and Fox's jury had been instructed about the entrapment defense and the government's burden of proof thereunder. Consistent with the five factors which this Court has identified for determining a defendant's predisposition, [4] the jury was instructed that the government has "the burden of proving beyond a reasonable doubt that the Defendant was already willing to commit the crime prior to first being approached by government agents or other persons acting for the government," and that the factors the jury "may consider in deciding whether the government has proved this" include:

> Ask yourself what the evidence shows about the Defendants' character and reputation? Ask yourself if the idea of committing the crime originated with or came from the government? Ask yourself if the Defendant took part in the crime for profit? And ask yourself if the Defendant took part in any similar criminal activity with anyone else before or afterwards? Ask yourself if the Defendant showed any reluctance to commit the crime, and if he did, whether he was overcome by government persuasion? And ask yourself what kind of persuasion and how much persuasion the government used?

(TT2, PageID # 16173-74.) The jury was also instructed on inducement that: "Government actions that could amount to inducement include persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward or pleas based on need, sympathy or friendship." (TT2, PageID # 16172.)

The barred admissions, as detailed above, are in the wheelhouse of the factors which the jury was required to consider, on *both* of entrapment's elements (inducement and predisposition), and the barred admissions *supported* Croft and

---

[4] These factors were cited in Croft's main brief, as was one of this Court's cases in which they are set forth. See Croft Brief at pp. 37-42, citing United States v. Nelson, 922 F.2d 311, 317 (6th Cir. 1990). See also United States v. Martin, 780 Fed. Appx. 248, 251 (6th Cir. 2019); United States v. Johnson, 855 F.2d 299, 303 (6th Cir. 1988).

34

Fox's defense. In other words, the evidence would have made it significantly more difficult for the government to meet its beyond-a-reasonable doubt burden on inducement and predisposition. The barred admissions provided evidence, *in their own words* as uttered by **Chambers**, **Chappel**, **Robeson**, **Plunk**, et al., that:

- Ideas for committing the crime originated with them and were aggressively pushed by them.

- They worked, as a team, to strategize about and work aggressively to overcome Croft's and Fox's respective reluctance, and they pushed a fast timeline with a purpose to overwhelm any resistance.

- Their "persuasion" was strategic, planned, and collusive, and included illegal and unethical acts.

- Their "persuasion" was unrelenting and was applied to nearly every event and every detail, including who would be invited to which events (alleged "overt" acts), ensuring attendance at those events, and even such details as *seating* at events so as to facilitate their audio capture of incriminating "statements" which they aggressively sought to induce.

- Their "persuasion" included fraudulent representations, coercive tactics, harassment, and promises of reward.

There are *dozens* of barred 801(d)(2)(D) admissions. There is a reasonable probability that any one or more would have tipped the jury's verdict, in this close case, to outright acquittals (as in Trial 1), or at least another hung jury reflective of the government's failure to achieve the required unanimous agreement that it met its burden; the allowance of *all* the improperly barred admissions would certainly have done so. Even under the more lenient harmlessness standard for "non-constitutional" errors (<u>Kettles</u>), there can be no "fair assurance" that the verdict was not "substantially swayed" by the subject error; that same error (because it is surely a "constitutional" one, as addressed above), therefore, is likewise obviously not harmless under <u>Chapman</u>.

Finally, the error's prejudicial impact on Croft and Fox's ability to pursue their entrapment defense infested the entire trial, further affirming that it was not harmless error under either standard. These accused men should have been permitted to use *all* the Federal Rules of Evidence in pursuing their defense and to rely on the

35

precedent of <u>Sherman</u> and <u>Branham</u>. Instead, the district court cancelled 801(d)(2)(D) and it disregarded <u>Sherman</u> and <u>Branham</u>, thereby *both* facilitating the government's efforts to disable any meaningful examination of the conduct of the government's agents-informants *and* furthering the government's trial strategy to "disown [its agent/informants] and insist it is not responsible for [their] actions." <u>Sherman</u>, 356 U.S. at 373.

Permitting the defendants to present the non-authorized vicarious admissions of **Robeson** and **Plunk**, for example, as non-hearsay *substantive evidence* during the defense case, or during cross-examination of the government's own witnesses, would have completely changed the trial to the defendants' advantage, in a manner squarely within the contemplation of 801(d)(2)(D). With the admissions made by **Robeson** and **Plunk** as substantive evidence for the jury's consideration, the government would have been forced to decide whether to call **Robeson** and/or **Plunk** as witnesses to have them try to explain the admissions they made on behalf of their government-principal or to provide context, even if that meant immunizing **Robeson** to do so. The jury, therefore, would either have gotten to hear from **Robeson** and/or **Plunk** themselves, or the government would have been stuck with their respective admissions, but in either event the government would not have been permitted to disown them and pretend their admissions do not exist.

It is, of course, possible (although highly unlikely) that Croft and/or Fox may have still been convicted *even if* the trial's errors had not occurred and *even if* the above-listed admissions had all been allowed as substantive evidence for the jury's consideration. "The existence of such a possibility, however, is not equivalent to proof that the error was harmless beyond a reasonable doubt," <u>Ellis</u>, 941 A.2d at 1051, nor is it even proof that with "fair assurance" the verdict was not "substantially swayed" by the error.

36

## III. Conclusion

The Appellants' convictions should be reversed. They should be discharged on both "conspiracy" counts. Alternatively, they are entitled to a new trial and/or remand for a <u>Remmer</u>/<u>Phillips</u> hearing.

Date:  June 10, 2024

Respectfully submitted,

/s/ Timothy F. Sweeney

_____
Timothy F. Sweeney (0040027)
LAW OFFICE OF TIMOTHY F. SWEENEY
820 West Superior Ave., Suite 430
Cleveland, Ohio 44113
Phone: (216) 241-5003
Fax: (216) 241-3131
Email: tim@timsweeneylaw.com

Counsel for Appellant Barry Croft, Jr.


/s/ Steven S. Nolder

_____
Steven S. Nolder (0037795)
65 East State Street, Suite 200
Columbus, Ohio 43215
Phone: (614) 221-9790
Email: snolder9@gmail.com

Counsel for Appellant Adam Fox

## CERTIFICATE OF COMPLIANCE

The Court's order requesting this Supplemental Brief provides that there is no page/word limit.

/s/ Steven S. Nolder

_____

Steven S. Nolder (0037795)
Counsel for Appellant Adam Fox

## CERTIFICATE OF SERVICE

This is to certify that on June 10, 2024, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven S. Nolder

_____

Steven S. Nolder (0037795)
Counsel for Appellant Adam Fox